# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| SNAP FITNESS, INC., | Case No. 24-CV-2803 (NEB/DTS) |
| Plaintiff, | |
| v. | MEMORANDUM AND OPINION |
| SCENIC CITY FITNESS, INC., and GARY BLANKENSHIP, JR., | |
| Defendants. | |

---

This is a dispute between a franchisor and a former franchisee. Since 2016, Gary Blankenship, Jr. has operated a gym near Chattanooga, Tennessee. Until this summer, that gym operated under a Snap Fitness Franchise Agreement and was known as Snap Fitness Hixson. But in June, Blankenship tried to break away from Snap Fitness and operate a new gym in the same location. Snap Fitness moved for preliminary injunction (ECF No. 5), and on August 16, 2024, this Court granted the motion from the bench. (*See* ECF No. 26.). This order further explains the Court's reasoning.

## BACKGROUND

### I.   The Franchise Agreement

In 2016, Snap Fitness entered into a ten-year Franchise Agreement ("Agreement") with Blankenship, Jr. and his father.  (ECF No. 8 ("Ruth-Negrini Decl.") ¶ 13.) The

next year, the Blankenships assigned their interest to Scenic City Fitness, Inc. (*Id.* ¶ 14.)

Blankenship, Jr. is an owner of Scenic City Fitness. (*Id.* ¶ 15.) The Court will refer to

Blankenship, Jr. and Scenic City Fitness collectively as Defendants.

Six provisions of the Agreement are at issue:

1. **Section 3.B 'Use of the Marks'** - Franchisees "may not use, or permit the use of, any trademarks, trade names or service marks in connection with the Club except those listed in Attachment A or except as we otherwise direct in writing." (ECF No. 8-1 ("Agreement") at 6 (emphasis omitted).)[1]

2. **Section 6.H 'Confidential Information'** – Franchisees "may not . . . communicate, divulge or use for the benefit of any other person or entity any Confidential Information." Confidential Information includes "all member information and information concerning prospective and former members." (*Id.* at 12.)

3. **Section 10.D 'Non-compete Covenants'** – Franchisees "agree that you will receive training and Confidential Information that you otherwise would not receive or have access to but for the rights licensed to you under this Agreement." (*Id.* at 20.)

4. **Section 10.D.2 'During Term'** – During the term of the Agreement, franchisees "must not" "divert" members to "any fitness club except another Snap Fitness" or "own, operate, lease, franchise, engage in, be connected with, have any interest in, or assist any person or entity engaged in any other fitness club." (*Id.*)

5. **Section 10.D.3 'After Termination'** – "For a period of two years" after termination, franchisees agree not to "divert" members to any other gym besides another Snap Fitness and to not operate any other fitness club "that is located at or within a 10-mile radius of the Authorized Location." (*Id.*)

6. **Section 13.C 'Termination by You'** – To terminate the Agreement, franchisees must first give written notice of the breach and then provide Snap Fitness 60 days to cure the alleged beach. (*Id.* at 27–28.)

---

[1] Page cites are to CM/ECF pagination, not a document's native pagination, unless otherwise noted.

## II.    Defendants Attempt to Break Away from Snap Fitness

On June 21, 2024, Defendants sent Snap Fitness an email with the subject line "Notice of Termination." (Ruth-Negrini Decl. ¶ 20.) Defendants claimed Snap Fitness owed them $9,188. (*Id.*) The email was Defendants' attempt to terminate the Agreement. (*Id.*)

Snap Fitness responded three days later. It paid Defendants $6,400—the amount Snap Fitness believed was due. (*Id.* ¶ 21.) Snap Fitness explained that it had withheld some amount because Defendants had failed to pay certain franchise fees and provide updated billing information.[2] (*Id.*)

Unsatisfied, Defendants decided "to rebrand from Snap Fitness" and open their own gym. (Blankenship Decl. ¶ 25.) Defendants felt they "had no other option" but to break away "so that [they] could start collecting revenue directly." (*Id.*)

Thus, a few days later, Defendants began promoting their rebranded gym: Scenic City Fitness 24/7. (Ruth-Negrini Decl. ¶ 22.) It operated out of the same location as Snap Fitness Hixson. In a Facebook video, Blankenship announced:

> over the next 30 days we're going to be de-branding from Snap Fitness and transferring over to our own independent gym Scenic City Fitness 24/7. What does that mean for you guys? You're not going to see any changes. It's going to be same billing. It's going to be the same gym. It's going to have the same great amenities and it's going to be 24/7, just like everybody likes.

(*Id.*)

---

[2] It is unclear from the record whether Snap Fitness's response addressed Defendants' attempt to terminate the agreement.

After the announcement, members had questions. They asked whether Scenic City Fitness 24/7 would continue to accept health insurance reimbursements, how their memberships would transition, and whether they needed to update their credit card information. (*Id.* ¶¶ 29–30.) Blankenship addressed those concerns in another Facebook video: "[W]e are trying everything that we can to make sure that every single member that has been with us at Snap Fitness Hixson will continue to be with us at Scenic City Fitness 24/7." (ECF No. 8-4 at 00:23–30.)

As part of their rebranding, Defendants created a new logo. It featured a blue image of the Chattanooga skyline with "Scenic City Fitness 24/7" written in a circle. (*E.g.,* ECF No. 8-7.) In at least four promotional materials, the new logo "breaks through" the Snap Fitness logo. Defendants posted the "break through" logo on Facebook and YouTube. (ECF Nos. 8-7, 8-12.) Defendants even created a physical banner of the logo to hang up at the gym. (ECF Nos. 8-7, 8-12.) Text at the bottom of one image states, "Same Great Gym Now More Local!" (ECF No. 8-7.)



| Image 1 (ECF No. 8-7) | Image 2 (ECF No. 8-4 at 01:01–08) |
| Image 3 (ECF No. 8-12) | Image 4 (ECF No. 8-7) |

On July 3, Snap Fitness sent Defendants a cease-and-desist letter. (ECF No. 1 ("Compl.") ¶ 49.) The letter demanded that Defendants: "immediately cease and desist from operating a competitive business and cease any unauthorized, infringing, or confusing uses of Snap Fitness's trademarks or confidential, proprietary, and trade secret information." (ECF No. 8-8 ("July 3 Letter") at 6.) It made three specific points:

1. Snap Fitness stated that Defendants' email purporting to terminate the Agreement was "devoid of legal merit." (*Id.* at 2.) Snap Fitness reminded Defendants that terminating the Agreement required: (1) identifying an alleged material breach, and (2) providing Snap Fitness 60 days to cure the breach. (*Id.* at 2–3.) Snap Fitness disagreed that the dispute over membership payments qualified as a material breach. And even if there was a breach, Defendants had not provided Snap Fitness 60 days to cure.

2. Snap Fitness warned Defendants that their "creation of a competing 24-hour fitness business" was "a clear violation of the in-term restrictive covenants in the Franchise Agreement." (*Id.* at 3.) It cautioned that Defendants appeared to be diverting Snap Fitness members to Scenic City Fitness 24/7, which would violate Section 10.D.2 of the Agreement.

3. Snap Fitness maintained that Defendants had "engaged in egregious misuse" of Snap Fitness trademarks. (*Id.* at 4.)

After receiving the letter, Defendants did not close the gym. Instead, they sent Snap Fitness their own letter on July 12 which demanded "the smooth transfer of Membership Data" and requested that Snap Fitness "not withhold any funding and or future payouts." (ECF No. 8-10.) The letter also stated that Defendants "wishe[d] to be left alone and to proceed as an Independent Fitness Center." (*Id.*)

On July 17, Snap Fitness sent Defendants a "Notice of Termination" "noticing defaults for abandonment, unauthorized use of Confidential Information, in-term diversion of Club members, and for impairment of the goodwill associated with the Marks, and providing an opportunity to cure." (Ruth-Negrini Decl. ¶ 34; *see* ECF No. 8-11.) The letter provided Defendants with 24 hours to cure some noticed defaults and 30 days to cure other noticed defaults. (ECF No. 8-11 at 3, 5.)

Still, Defendants continued to operate Scenic City Fitness 24/7. In response, Snap Fitness emailed members: "Your Snap Fitness membership will automatically terminate, and your access card will be deactivated, both effective as of July 22, 2024. You will not be billed by Snap Fitness going forward." (ECF No. 20-1.)

Snap Fitness filed its complaint on July 19 and its motion for a Preliminary Injunction on July 24. (Compl.; ECF No. 5.) Snap Fitness seeks injunctive relief directing Defendants to immediately: (1) cease operating a competing business, (2) comply with the Agreement's post-termination obligations, and (3) cease engaging in unfair competition. (Compl. at 21.) It also seeks a declaration that Defendants breached the Agreement and that Snap Fitness properly terminated the Agreement.[3] (*Id.*)

---

[3] While not relevant to this motion, Snap Fitness also seeks monetary relief: (1) damages for the losses sustained by Snap Fitness and the profits Defendants derived from their violations, (2) treble damages and prejudgment interest as provided for in Section 35 of the Lanham Act, and (3) reasonable costs and expenses, including attorneys' fees, incurred in enforcing the Agreement. (Compl. at 21–22.)

## ANALYSIS

The Court considers four factors in deciding whether to issue a preliminary injunction: (1) Snap Fitness's likelihood of success on the merits, (2) the threat of irreparable harm to Snap Fitness if the injunction is denied, (3) the balance between that threat of harm and the injury that granting injunctive relief would inflict on Defendants, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). As the movant, Snap Fitness bears the burden of establishing its entitlement to an injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

At oral argument, Defendants suggested that denying the injunction—thereby allowing Scenic City Fitness 24/7 to stay open—would preserve the status quo. Not so. A defendant in a motion for preliminary injunction cannot race to establish a new normal and then ask that the Court define the status quo as the state of things on the day of the hearing. "The status quo is the last uncontested status which preceded the pending controversy." *Minn. Mining & Mfg. Co. v. Meter ex rel. NLRB*, 385 F.2d 265, 273 (8th Cir.

1967) (citation omitted). In this case, the last uncontested status is the period *before* Defendants began operating Scenic City Fitness 24/7.

## I.     Likelihood of Success on the Merits

Snap Fitness asserts that it is likely to succeed on (1) its breach-of-contract claims for Defendants' alleged violation of the Agreement's noncompete covenants, and (2) its trademark infringement claims.

### A.     *Breach of Noncompete Covenants*

There is no question that Defendants have breached all three noncompete covenants, and quite boldly so.

#### 1.     *Section 10.D.2 'During Term' Noncompete Covenant*

During the term of the Agreement, Section 10.D.2 prevents franchisees from diverting members to any other gym and operating "any other fitness club." (Agreement at 20.) Yet Defendants did exactly that. Twenty-nine days before Snap Fitness terminated the Agreement, Blankenship posted a video telling members that "we are trying everything that we can to make sure that every single member that has been with us at Snap Fitness Hixson will continue to be with us at Scenic City Fitness 24/7." (ECF No. 8-4 at 00:23–30.) Snap Fitness is likely to succeed on its claim that Defendants breached Section 10.D.2.

2.      *Section 10.D.3 'After Termination' Noncompete Covenant*

The "After Termination" provision prevents franchisees from operating any other gym for a certain amount of time—two years—and within a certain geographic area—a 10-miles radius of the franchisee location. (Agreement at 20.) It also precludes franchisees from diverting former Snap Fitness members to another gym for two years post-termination. (*Id.*)

Again, there is no question that Defendants breached Section 10.D.3. On the day the Agreement terminated, Defendants were operating a competing gym from the same location as Snap Fitness Hixson. The slogan for Scenic City Fitness 24/7—"Same Great Gym Now More Local!"—is evidence of Defendants' attempt to retain former Snap Fitness members. (ECF No. 8-7.) Snap Fitness is likely to succeed on its claim that Defendants breached Section 10.D.3.

3.      *Sections 6.H and 10.D "Confidential Information" Noncompete Covenants*

Together, Sections 6.H and 10.D prevent franchisees from using confidential information and member information "for the benefit of any other person or entity." (Agreement at 12, 20.) Member information "belong[ed] exclusively" to Snap Fitness, franchisees could not "duplicate any materials" with member information, and those prohibitions "survive[d] [the] expiration" of the Agreement. (*Id.* at 12.)

Evidence suggests that Defendants transferred member information between Snap Fitness Hixon and Scenic City Fitness 24/7. One gym-goer emailed Snap Fitness and

expressed confusion as to how the new gym was able to bill her.[4] (ECF No. 23-5.) Another complained that she was "[c]harged for a membership I never signed up for" and speculated that Defendants "went through old records" from Snap Fitness. (ECF No. 23-4.) Someone else claimed Scenic City Fitness 24/7 "automatically signed me up for a gym membership." (*Id.*)

Although the mechanics of how Defendants may have transferred members—and their billing information—are unclear, the evidence before the Court establishes that Snap Fitness is likely to succeed on its claim that Defendants misused member information and breached Sections 6.H and 10.D.

    4.    *Enforceability*

Defendants do not really dispute that they breached the Agreement's noncompete covenants. Instead, they contest the covenants' enforceability.

Defendants are correct that in Minnesota, noncompete covenants must be reasonable to be enforced.[5] *Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985)

---

[4] The former Snap Fitness customer wrote: "The snap fitness location (that shut down) sent me an email saying my membership was cancelled, effective immediately, and now the new place is billing me. Interesting… ." (ECF No. 23-5.)

[5] As of July 1, 2023, Minnesota law prohibits post-employment noncompete agreements. Minn. Stat. § 181.988. That law is not relevant here—it only applies to contracts "entered into on or after" July 1, 2023, and it addresses employment agreements, not franchise agreements. *See Waxing the City Franchisor LLC v. Katularu*, No. 24-CV-02479 (JMB/DJF), 2024 WL 3887109, at *10 n.14 (D. Minn. Aug. 20, 2024) ("The Court does acknowledge a rising tide of public policy measures that disfavor non-competes; however, those policy

(interpreting Minnesota law). For franchisees, a two-year prohibition on competition is both common and fair.[6] Geographic restrictions tend to vary—what is reasonable for a waxing studio in Arizona is different from a tax preparation office in Massachusetts.[7] The Agreement's ten-mile restriction reasonably protects Snap Fitness's ability to place new franchises in the Chattanooga metropolitan area.[8] The noncompete covenants are reasonable and therefore enforceable.

Defendants make four arguments against enforcement. (ECF No. 19 at 25-27.) None is persuasive.

---

measures mostly implicate non-competes in employer-employee relationships and not in franchisor-franchisee relationships.").

[6] *See, e.g.*, *Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167, 1178, 1193 (D. Minn. 2020) (declining to find two-year restriction unreasonable); *Waxing the City*, 2024 WL 3887109, at *3, *6 (finding franchise noncompete with two-year restriction reasonable); *Anytime Fitness, LLC v. Edinburgh Fitness LLC* ("*Edinburgh Fitness*"), No. 14-CV-348 (DWF/JJG), 2014 WL 1415081, at *5 (D. Minn. Apr. 11, 2014) (two-year restriction reasonable for salon franchisee); *Anytime Fitness, Inc. v. Rsrv. Holdings, LLC* ("*Reserve Holdings*"), No. 08-4905(MJD/JJK), 2008 WL 5191853, at *4 (D. Minn. Oct. 8, 2008) (two-year restriction reasonable for gym franchisee).

[7] *Compare Waxing the City*, 2024 WL 3887109, at *6 (ten-mile restriction reasonable for waxing studio in Phoenix metro area) *with H&R Block Tax Servs., LLC v. Murphy*, No. 13-00318-CV-W-GAF, 2013 WL 12129647, at *4 (W.D. Mo. Apr. 2, 2013) (twenty-five-mile restriction reasonable for tax preparation office in southern Massachusetts).

[8] *Reserve Holdings*, 2008 WL 5191853, at *4 (five miles held reasonable); *Anytime Fitness, Inc. v. Fam. Fitness of Royal, LLC*, No. 09-CV-3503 (DSD/JSM), 2010 WL 145259, at *4 (D. Minn. Jan. 8, 2010) (finding county-specific restriction reasonable).

First, Defendants argue that the covenants are unnecessary to protect new franchisees because Snap Fitness has not yet attempted to refranchise the area. But Snap Fitness only needs to show that the covenant is reasonably necessary to protect its business or goodwill. *Prow*, 770 F.2d at 120. It need not introduce evidence that it is actively refranchising the area.

Second, Defendants claim that the Agreement's protection of franchisee training is unreasonable because Defendants are not using any information that they learned from Snap Fitness to operate Scenic City Fitness 24/7. Snap Fitness has a legitimate interest in protecting the information franchisees learn through training, even if Defendants themselves claim to not use such information.

Third, Defendants argue the covenants are unreasonable because in California, "post-term noncompetes are largely unenforceable." (ECF No. 19 at 26.) But this dispute is governed by Minnesota law,[9] and Minnesota does not prohibit franchise noncompete covenants.

Finally, Defendants argue that they have not violated Section 10.D.3's geographic restriction. This argument seems to assume the reasonability of the covenant's geographic

---

[9] Section 15.H.1 of the Agreement states that "all claims arising out of or relating to this Agreement and the parties' relationship will be governed by, and will be interpreted in accordance with, the substantive laws of the state of Minnesota." (Agreement at 30.) Defendants do not dispute this.

restriction. In any case, compliance with one restriction would not obviate Defendants'

obligation to comply with other restrictions.

### B.    Trademark Infringement Under the Lanham Act[10]

When the party moving for a preliminary injunction shows that it is likely to

succeed on one claim, there is no need for the Court to analyze additional claims. *United*

*Healthcare Ins. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002). To be thorough,

however, the Court will address Snap Fitness's likelihood of success on its infringement

claims.

"To prove a trademark infringement claim, a plaintiff must show that it has a valid,

protectible mark and that there is a likelihood of confusion between its mark and the

defendant's mark." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir.

2009). Defendants do not contest the validity of Snap Fitness's marks.[11] Thus, the Court

only addresses whether Snap Fitness is likely to succeed on the likelihood-of-confusion

prong.

---

[10] Snap Fitness's complaint alleged violations of Section 32 (trademark infringement) and 43(a) (unfair competition) of the Lanham Act. (Compl. ¶ 80.) Its briefing, however, focuses only on trademark infringement. This order will analyze Snap Fitness's likelihood of success on just its trademark infringement claims. *See* J Thomas McCarthy, 1 *McCarthy on Trademarks & Unfair Competition* § 2:7 (5th ed.) ("There is no essential difference between trademark infringement and what is loosely called unfair competition." (citation omitted)).

[11] Snap Fitness has five federally registered marks. (Ruth-Negrini Decl. ¶ 6.) The "registration of a mark creates a rebuttable presumption that the mark is valid." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994).

But rather than disputing likelihood of confusion, Defendants argue Snap Fitness is unlikely to succeed because they no longer use the "break through" logo, rendering the infringement claims "moot." (ECF No. 19 at 23.) Not so.

A plaintiff's infringement claim is not mooted just because a defendant stops using the mark. *See Rainforest Cafe, Inc. v. Amazon, Inc.*, 86 F. Supp. 2d 886, 905 (D. Minn. 1999) ("[T]his Court rejects the argument that cessation of use renders [defendant's] counterclaim of trademark infringement and dilution of trademark moot."); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."). For voluntary cessation to moot an infringement claim, it must be "absolutely clear" that a defendant's "allegedly wrongful behavior could not reasonably be expected to recur." *Already*, 568 U.S. at 91 (citation omitted). Defendants have not met this "formidable burden." *Id.* True, they claim that they have "fully rebranded to their own independent gym." (ECF No. 19 at 23.) But courts require something more than a defendant's promise not to use the mark to moot a trademark claim. *See BIO Mgmt. Nw. Inc. v. Am. Bio Servs.*, No. C21-724-TL-BAT, 2022 WL 1666946, at *3 (W.D. Wash. May 3, 2022) (voluntary cessation mooted injunctive relief for an infringement claim, in part, because defendants formally abandoned the challenged trademark application at the U.S. Patent and Trademark Office), *report and recommendation adopted*, 2022 WL 1658634 (W.D. Wash. May 25, 2022).

On the merits, Defendants' "break through" logo is likely to confuse consumers.[12] The logo incorporated almost the entire Snap Fitness mark. Because both parties are gym-owners, their products compete, which increases the likelihood of confusion. What's more, Snap Fitness found instances of actual consumer confusion. (Ruth-Negrini Decl. ¶¶ 29-30.) Defendants' characterization of the "break through" logo as "permissible comparative advertising," (ECF No. 19 at 24), misconstrues that doctrine. *See Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503–04 (8th Cir. 1987). "An imitator may use in a truthful way an originator's trademark when advertising that the imitator's product is a copy *so long as* that use is not likely to create confusion in the consumer's mind." *Id.* at 503 (emphasis added). Snap Fitness is likely to succeed on its claims that Defendants violated Section 32 of the Lanham Act.

## II.     Irreparable Harm

If the injunction is denied, the harm to Snap Fitness is irreparable. The integrity of a franchise system requires both franchisor and franchisee to uphold their ends of the bargain. If one disgruntled franchisee is allowed to brazenly break away from the franchisor, it would send irreparably damaging signals to other franchisees. Some might

---

[12] Courts consider several factors in determining consumer confusion:

> (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Select Comfort Corp. v. Baxter*, 996 F.3d 925, 933 (8th Cir. 2021).

see it as a chance to reap the benefits of a franchise system, then jump ship, with no consequences. *Edinburgh Fitness*, 2014 WL 1415081, at *7 ("If the non-compete covenant is not enforced, Defendants and other franchisees may think they can take advantage of [franchisor's] knowledge, information, training, and goodwill to build a business, and then leave the system and start their own identical business to avoid paying fees."). Others might question the benefit of remaining a part of the franchise system. *See Reserve Holdings*, 2008 WL 5191853, at *6 ("If the preliminary injunction is not granted to enforce [franchisor's] covenant not to compete, its good will will be harmed by a competing business operating at the former Anytime Fitness location."). These threats to a franchise system are not compensable by money damages.

### III.    Balance of Harms

The Court balances the harm Snap Fitness would suffer without an injunction with the harm Defendants would suffer if the injunction were issued. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). This factor favors Snap Fitness.

The Court acknowledges that forcing Defendants to close their gym is a significant harm, "particularly where the business constitutes the sole livelihood of the owner." *Mainstream Fashions Franchising*, 453 F. Supp. 3d at 1205; *see also CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) ("[I]t appears undisputed that an injunction would put the defendants out of business"). Yet Defendants' harm is self-inflicted—they improperly attempted to terminate the Agreement and brazenly forged

ahead with a new gym even after Snap Fitness warned them of the consequences. The harm was completely avoidable. *See Reserve Holdings*, 2008 WL 5191853, at *6 ("Simply because the franchisee accuses the franchisor of failing to perform under the franchise agreement, the franchisee is not excused from following the franchise agreement.").

By contrast, without an injunction, Snap Fitness faces "damage to the integrity and functioning of its franchise system as a whole." *Edinburgh Fitness*, 2014 WL 1415081, at *8. In addition, Snap Fitness will suffer loss of goodwill, has already suffered loss of customers, and seems likely to have suffered loss of proprietary information. *Id.* Future efforts to open a new franchise in the area have also been damaged. The balance of harms favors Snap Fitness.

## IV.    Public Interest

The public interest favors granting the injunction. It would "ensure that parties to franchise arrangements can contract on issues such as non-competition and then expect each other to abide by agreed upon terms." *Id.* Additionally, preventing customer confusion and trademark infringement serves the public interest. *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 847 (D. Minn. 2011).

Snap Fitness is likely to succeed on the merits of its breach of noncompete covenants claims and its infringement claims. The damage to its franchise system is irreparable, the balance of harms favors Snap Fitness, and the public interest favors granting the injunction.

## V.     Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citation omitted).

Defendants argue that a $500,000 bond is appropriate, given that issuing the preliminary injunction "would leave Defendants and their employees without livelihoods for the duration of this lawsuit." (ECF No. 19 at 30.) Snap Fitness responds that no bond should be required. Based on its review of the record, the Court concludes that the amount of $25,000 is proper to support costs and damages sustained by Defendants if they are found to be wrongfully enjoined. *See Reserve Holdings*, 2008 WL 5191853, at *7 (requiring gym franchisor to post $25,000 bond in dispute with franchisee).

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     The motion for preliminary injunction (ECF No. 5) is GRANTED;

2.      Accordingly, it is hereby ORDERED that Defendants, their officers, agents, servants, employees, attorneys, and all those in active concert or participation with them, are preliminary enjoined as follows:

a.      Must immediately cease operating a fitness club, studio or exercise facility under the name Scenic City Fitness, Inc., or any other name, at or within 10 miles of Defendants' former Snap Fitness franchised business located in Hixson, Tennessee.

b.      Shall immediately and fully comply with the post-termination obligations set forth in the Franchise Agreement, including but not limited to Section 14 and Section 3.B of the Franchise Agreement.

c.      Cease and desist from using any of Snap Fitness's trademarks, tradenames, service marks, and other commercial symbols or any confusingly similar names or trademarks, including but not limited to Registration Nos. 3084847, 3107672, 3391628, 90858367, 90858365.

d.      Immediately cease and desist from directly or indirectly identifying themselves or any business as a current or former Snap Fitness franchise.

e.      Deliver to Snap Fitness all materials containing Snap Fitness's Marks or otherwise identifying or relating to a Snap Fitness franchised business.

f.      Cease using any of Snap Fitness's Confidential Information (as that term is defined in the Franchise Agreement) in connection with any business, including all Member Information (as that term is defined in Section 6.H the Franchise Agreement),

and return to Snap Fitness all copies of manuals and any other confidential materials that Snap Fitness has loaned Defendants.

g.      Immediately cease using any telephone number formerly associated with Defendants' Snap Fitness franchised business, including but not limited to 423-665-4120, and notify the telephone company and listing agencies of the termination of Defendants' right to use the number(s).

h.      Cooperate with Snap Fitness to the extent Snap Fitness exercises its rights to assume the lease, utilities, telephone numbers, and/or rights and interest in Membership Contracts in compliance with Section 14.B of the Franchise Agreement.

3.      Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs shall post a bond in the amount of $25,000.[13]

Dated: October 18, 2024              BY THE COURT:

                                     s/Nancy E. Brasel
                                     Nancy E. Brasel
                                     United States District Judge

---

[13] The Court granted the motion from the bench on August 16, 2024. (ECF No. 26.) Snap Fitness posted the $25,000 bond on August 20, 2024. (ECF No. 32.)